In re: Robert A. MILTON, Debtor

Rain Bird Corporation Plaintiff

v.

Robert A. Milton Defendant.

Bankruptcy No. 02–16363.
Adversary No. 03–1029.

United States Bankruptcy Court,
N.D. Mississippi.

April 3, 2006.

Leroy D. Percy, Oxford, MS, for Rain Bird Corporation, Creditor.

Robert A. Talley, Memphis, TN, for Robert A. Milton, Debtor.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is a motion for summary judgment filed by the plaintiff, Rain Bird Corporation, ("Rain Bird"), and a motion for partial summary judgment filed by the defendant/debtor, Robert A. Milton, ("Milton"); responses thereto and memoranda of law having been filed by the opposing parties; and the court, having heard and considered same, hereby finds as follows, to-wit:

### I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I).

### II.

### *Procedural Background and the Applicability of Collateral Estoppel*

Rain Bird filed a complaint on February 1, 2002, in the United States District Court for the Northern District of Mississippi against National Pump Company, LLC, ("NPC"), Robert Milton, and Gregory I. Salisbury, (Salisbury), Cause No. 2:02CV018–M–D. The complaint sought damages from the defendants under the following causes of action: tortious interference with contract, tortious interference with business relations, misappropriation of trade secrets, breach of fiduciary duty, and civil conspiracy.

During the pendency of the district court litigation, Milton filed a voluntary petition seeking relief under Chapter 7 of the Bankruptcy Code. Thereafter, Rain Bird initiated the above captioned adversary proceeding against Milton requesting this court to find that any debts, owed to Rain Bird as determined by the district court, to be non-dischargeable pursuant to § 523(a)(4) and (6) of the Bankruptcy Code. As a result of a separate motion, this court stayed the bankruptcy adversary proceeding, but lifted the automatic stay so that the district court litigation could be tried to a conclusion.

As an analysis of the factual events pertinent to this proceeding, the court incorporates by reference the Memorandum Opinion ("Mem.Op.") issued on December 23, 2003, by United States District Judge Michael P. Mills in that cause of action styled *Rain Bird Corporation v. National Pump Company, LLC; Robert Milton; and Gregory Salisbury*, Cause No. 2:01CV018–M–D, United States District Court for the Northern District of Mississippi. The "final judgement" entered in that lawsuit provides as follows:

> Pursuant to the memorandum opinion issued this day, the court hereby finds for the plaintiff in the above-styled case and awards damages as follows:
>
> 1. $1,200,000.00 in actual damages, for which all defendants are jointly and severally liable;

2. $1,537,947.00 in actual damages for which Milton and NPC are jointly liable;

3. $131,220.00 in actual damages for which Milton is solely liable;

4. $94,256.00 in actual damages for which Salisbury is solely liable;

5. $5,000,000.00 in punitive damages for which NPC is solely liable; and

6. $500,000.00 in punitive damages for which Milton is solely liable.

It is also hereby ORDERED that NPC provide Rain Bird with the original production materials related to Rain Bird pump stations and to cause the Pump Monitor source code still in its counsel's possession to be deleted or destroyed.

Milton appealed the district court's judgment against him, which was affirmed by the United States Court of Appeals for the Fifth Circuit. After the amounts awarded became final, Milton filed his answer in this adversary proceeding, denying that the judgment debts were non-dischargeable.

Rain Bird filed its motion for partial summary judgment contending that Milton is collaterally estopped from challenging or relitigating in this adversary proceeding the factual issues determined by the district court. In his response, Milton concurs that collateral estoppel is applicable, acknowledging that preclusive effect should be given to the district court's opinion. A brief comment on collateral estoppel is set forth as follows:

 "[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *RecoverEdge, L.P. v. Pentecost,* 44 F.3d 1284, 1290 (5th Cir. 1995) (quoting *Ashe v. Swenson,* 397 U.S.

436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970)).

In *Grogan v. Garner,* 498 U.S. 279, 284, n. 11, 111 S.Ct. 654, 658, n. 11, 112 L.Ed.2d 755 (1991), the United States Supreme Court held that collateral estoppel principles "apply in discharge exception proceedings pursuant to § 523(a)."

 The Fifth Circuit has held that for collateral estoppel to apply, the following three requirements must be met, to-wit: (1) The issue to be precluded must be identical to that involved in the prior action; (2) in the prior action the issue must have been actually litigated; and (3) the determination made of the issue in the prior action must have been necessary to the resulting judgment. *Matter of Davis,* 3 F.3d 113, 114 (5th Cir. 1993) (citing *In re Shuler,* 722 F.2d 1253, 1256, n. 2 (5th Cir.1984)).

Bringing unanimity to the applicability of collateral estoppel, this court agrees that preclusive effect should be given to the factual issues decided by the district court. Those issues will be discussed in more depth as they relate to each non-dischargeability claim.

### III.

*The Award Against Milton in the Amount of $1,200,000.00 for Tortious Interference with Contract, Tortious Interference with Business Relations, and Misappropriation of Trade Secrets*

Rain Bird asserted that Milton, along with the other defendants, tortiously interfered with confidentiality obligations that Golf Course Irrigation Services, Inc., ("GCIS"), had conveyed to Rain Bird through contracts that had been individually executed on behalf of GCIS by Salisbury and Milton. The factual underpinnings of these allegations center on confidential information about Rain

Bird's products and prospective customers, in the possession of GCIS, which was disclosed by Milton and Salisbury to NPC. Rain Bird also contended that these disclosures constituted misappropriation of its trade secrets. Because the district court concluded that Milton participated in these acts, he was found to be jointly and severally liable with the other defendants for damages caused to Rain Bird in the sum of $1,200,000.00.

In the case of *Raspanti v. Keaty (Matter of Keaty)*, 397 F.3d 264 (5th Cir.2005), Chief Judge Carolyn King discussed the Fifth Circuit standard for maintaining a cause of action under § 523(a)(6) of the Bankruptcy Code, as follows:

> Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt incurred for willful and malicious injury by the debtor to another entity. 11 U.S.C. § 523(a)(6)(2004). Section 523(a)(6) of the Bankruptcy Code specifically provides:
>
> > § 523. Exceptions to discharge
> >
> > (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt...
> >
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity....
>
> *Id.* The Supreme Court, in *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), stated that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." The Fifth Circuit extended *Kawaauhau*'s reasoning in *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir.1998), and stated that "either objective substantial certainty [of injury] or subjective motive [to injure] meets the

Supreme Court's definition of 'willful ... injury' in § 523(a)(6)." (third alteration in original). The court in *Miller* went on to define the word "malicious" and specifically rejected that it meant an act without just cause or excuse. *Id.* at 605. Instead, the court defined "malicious" as an act done with the actual intent to cause injury. *Id.* at 606. The court noted that this definition is synonymous with the definition of "willful" and thus aggregated "willful and malicious" into a unitary concept. Thus, the court held that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Id.* at 606; *see also Williams v. IBEW Local 520 (In re Williams), 337 F.3d 504, 509 (5th Cir. 2003).*

397 F.3d at 269–70.

This court has applied the objective substantial certainty of harm standard in the case of *In re Smith*, 302 B.R. 530 (Bankr. N.D.Miss.2003), a proceeding involving the debtor's wrongful conversion of annuity payments which had been pledged to a creditor.

In its opinion, the district court set forth the requirements under Mississippi law to establish a claim of tortious interference with contract, to-wit:

> The four elements for this tort are: (1) That the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage or loss resulted.

Mem. Op. at 28 (quoting *Par Industries. Inc. v. Target Container Company*, 708 So.2d at 44, 48 (Miss.1998)).

The opinion continues as follows:

The element of willfulness and calculation does not require a showing on the part of the plaintiff that defendant had a specific intent to deprive plaintiff of contractual rights. Rather, the requisite intent is inferred when defendant knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or *substantially certain* will result in interference with the contract. (emphasis added)

Mem. Op. at 28 (quoting *Liston v. Home Insurance Company*, 659 F.Supp. 276, 281 (S.D.Miss.1986)) (citing *Cranford v. Shelton*, 378 So.2d at 652, 655 (Miss.1980)).

Again, Milton and Salisbury certainly knew of the confidentiality obligations, and NPC admittedly was aware of them as well after January 2, 2002. Furthermore, Milton and Salisbury made use of the information on behalf of NPC, which is therefore charged with the knowledge possessed by its agents Milton and Salisbury. The court finds that Milton, Salisbury and NPC all possessed knowledge of the obligation and took action which they were substantially certain would result in interference with the obligation. The Court finds that the intentional action was taken with the unlawful purpose of causing damage and loss, without regard or justifiable cause on the part of the defendants.

. . . . .

Rain Bird also complains of the transfer to NPC of the production materials related to Rain Bird pump stations and necessary for efficient service of those pump stations. It is clear that this information, including the job notebooks, drawings, electrical schematics, bills of materials and vendor listing, come within the purview of the "designs, drawings, blueprints," and information regarding Rain Bird "products" protected by the confidentiality provisions, and it is undis-

puted that this information passed into the possession of NPC on January 2, 2002. The court finds that an enforceable obligation existed that this information would not be disclosed or transferred to NPC, and that the obligation would have been performed had the materials not been transferred to NPC. The Court finds that Milton, Salisbury and NPC all possessed knowledge of the obligation and took action which they were substantially certain would result in interference with the obligation.

Mem. Op. at 34 and 35.

The "substantial certainty" standard for the level of intent required for a finding of tortious interference with a contract appears to be identical to the Fifth Circuit's "objective substantial certainty of harm" standard required for a finding of willful and malicious injury under § 523(a)(6) of the Bankruptcy Code.

The district court outlined the requirements under Mississippi law to establish a claim of tortious interference with business relations, to-wit:

"[T]he tortious interference with business relations occurs when a person unlawfully diverts prospective customers away from one's business." *Par Indus., Inc. v. Target Container Co.*, 708 So.2d 44, 48 (Miss.1998). The plaintiff must prove, by a preponderance of the evidence, the following elements: (1) the acts were willful and intentional; (2) the acts were calculated to bring about damage to the plaintiff's business; (3) the defendant's purpose to cause damage was neither right nor justifiable; and (4) actual damage and loss. *MBF Corp. v. Century Bus. Communications, Inc.*, 663 So.2d 595, 598 (Miss.1995).

Mem. Op. at 38.

Concerning this claim, the district court made the following factual findings and conclusions:

Rain Bird claims the defendants wrongfully diverted prospective customers away from Rain Bird for their own benefit. It is undisputed that after Milton informed Rain Bird that GCIS would no longer accept purchase orders from any customers, and that while Milton and NPC were negotiating for NPC to assume manufacturing operations using GCIS' assets and employees, GCIS continued to issue pump station quotes, including for prospective customers who had outstanding Rain Bird quotes. During its negotiations with Milton, NPC assumed, correctly, that Rain Bird had outstanding quotes to prospective customers, NPC knew that GCIS was continuing to issue its own quotes, and it was admittedly NPC's expectation that it would get some of that business. Indeed, as previously discussed herein above, after knowingly acquiring the confidential information regarding Rain Bird's prospective customers, NPC used that information to make quotes to many of those customers and in fact succeeded in making sales to several of them. Rain Bird, meanwhile, after NPC's lease of the GCIS assets secured by Rain Bird and NPC's assumption of operations at the GCIS facility, was left incapable of honoring its commitments to its prospective customers, most notably those who had actually ordered the Rain Bird product, including Mather Golf Course, for whom GCIS, after refusing further purchase orders from Rain Bird, issued its own quote, and for whom NPC ultimately performed and invoiced the installation. By their actions, the defendants simultaneously incapacitated Rain Bird's pump station prospects and diverted those prospects for the defendants' own benefit.

The Court finds that these acts by the defendants were willful, intentional and malicious, and that they were calculated to cause damage to Rain Bird's pump station business. That the acts were also calculated to benefit the defendants' own fledgling pump station business does not make the defendants' purpose right or justifiable, and the Court finds that it was not. The Court also finds that Rain Bird suffered actual damage in lost sales to prospective customers, including prospective customers who had actually ordered Rain Bird pump stations, as well as, prospective customers to whom NPC made sales using confidential information acquired from GCIS, resulting in unjust enrichment for NPC. The monetary amount of this loss suffered by Rain Bird is necessarily included in its lost future profits from pump station sales previously discussed herein above. The Court finds that Rain Bird's inability to honor its prospective customer quotes and purchase orders also caused damage to Rain Bird's reputation in the marketplace.

Mem. Op. at 38, 39, and 40.

The district court then addressed the elements under Mississippi law to establish the tort of misappropriation of trade secrets:

> This cause of action entails a showing of the following elements: (1) a trade secret existed; (2) the trade secret was acquired through breach of a confidential relationship or discovered by improper means; and (3) the use of the trade secret was without the plaintiff's authorization. *Union National Life Insurance Company v. Tillman*, 143 F.Supp.2d 638, 643 (N.D.Miss.2000).

Mem. Op. at 40.

The court analyzed each of the aforementioned elements and concluded that Rain Bird had established its claim for misappropriation against each of the defendants.

Mem. Op. at 43.

In discussing its award of punitive damages against Milton and NPC, the district court reiterated that it had concluded that all of the defendants' conduct (including Salisbury's) was malicious insofar as the tort of interfering with the obligations to keep Rain Bird's proprietary information confidential.

Mem. Op. at 39 and 44.

■ From the above discussion, it is clear to this court that the district court concluded that Milton had intentionally taken action with the unlawful purpose of causing damage and loss to Rain Bird concerning the disclosure of prospective customer information, as well as, the disclosure of materials related to Rain Bird products. These disclosures were substantially certain to result in interference with the confidentiality obligations owed to Rain Bird. Since the parties hereto have agreed that collateral estoppel is applicable to this adversary proceeding, this court concludes that the findings of the district court conclusively establish that Milton's actions were willful and malicious as contemplated by § 523(a)(6) of the Bankruptcy Code. As such, the assessment of damages against him in the sum of $1,200,000.00, as a joint and several obligation, is non-dischargeable in his bankruptcy case.

## IV.

*The Damages Awarded Against Milton in the Amounts of $1,537,947.00, $126,220.00 and $5,000.00 Related to Milton's Breaches of Fiduciary Duty and Tortious Interference with Contract*

Salisbury and Milton, on behalf of GCIS, executed the confidentiality agreements with Rain Bird as a part of their business venture to supply Rain Bird with irrigation pump stations and accessory products. In addition, GCIS borrowed $1,500,000.00 from Rain Bird which was secured by a second lien on all GCIS assets. Rain Bird's lien was subordinate, however, to the lien of InSouth Bank. The loan was individually guaranteed by Salisbury and Milton, and the loan agreement provided that GCIS would not dispose of any of its assets except in the ordinary course of business. As additional security, Salisbury and Milton pledged their shares of stock in GCIS to Rain Bird.

After these agreements were "in place," Salisbury and Milton began their course of business "dealings" with NPC. As set forth in detail in the district court's opinion and as discussed hereinabove, these "dealings" resulted in the tortious interference with Rain Bird's contract with GCIS, the tortious interference with Rain Bird's business relations with its customers, and the misappropriation of Rain Bird's trade secrets.

On October 24, 2001, "in spite of mounting financial difficulties," Milton resigned his position with GCIS, and disbursed to himself a sizeable severance package in the amount of $126,220.00. Rain Bird was not notified of this disbursement, contrary to the loan documentation, nor was the first lien holder, InSouth Bank.

On December 5, 2001, Milton and Salisbury formed Golf Course Irrigation *Systems*, Inc., then immediately changed the corporate name to Packaged Pumping Solutions, Inc., ("PPS"). Without advising Rain Bird, they transferred assets from GCIS to PPS, then sold these assets, also without notice, making profits of $5,000.00 each.

Shortly thereafter, GCIS leased its plant facilities to NPC. The lease agreement was negotiated exclusively by Milton.

The district court in its final judgment awarded actual damages in the amount of $1,537,947.00 for which Milton and NPC were jointly liable. The damages were calculated by the district court as follows: $1,314,000.00 in lost future profits; $8,349.00 in mitigation expenses; $125,598.00 in service expenses; and $90,000.00 in damages to Rain Bird's secured lien position. Mem. Op. at 55.

The district court found that Milton, as a director of GCIS and a corporate stock pledgor who was in effective control of GCIS, owed a fiduciary duty to Rain Bird, a secured creditor of GCIS and the pledgee of the GCIS stock. Mem. Op. at 48. The district court found that Milton breached his fiduciary duty to Rain Bird by leasing GCIS' facility and assets to NPC, thereby usurping Rain Bird's corporate opportunity. *Id.* at 51–54. As a result, the district court found that Rain Bird suffered a loss in the amount of $1,314,000.00, its lost future profits from the manufacture and sale of pump stations. *Id.* at 53.

Rain Bird presented evidence of the initial expenses that it incurred in its efforts to re-enter the pump station business which amounted to $8,349.00. The district court awarded damages for these expenses in order to mitigate Rain Bird's lost profits. *Id.* at 23.

■ Based on the district court's findings and the authorities set forth hereinbelow, this court concludes that the damages awarded in the sums of $1,314,000.00 and $8,349.00 were related to Milton's breach of his fiduciary duty to Rain Bird and his defalcation while serving in a fiduciary capacity, all as contemplated by § 523(a)(4) of the Bankruptcy Code.

■ The district court found that Rain Bird suffered a loss in the amount of $125,598.00 in service expenses that it in-

curred as a result of Milton's tortious interference with GCIS' warranty and service obligations to Rain Bird. The court found that Milton knew of these obligations and took action which obviously resulted in interference with the obligations. The court concluded that Milton's action was taken with the unlawful purpose of causing damage and loss. Mem. Op. at 33–34. Like Milton's tortious interference with the contractual confidentiality obligations, this conduct meets the objective substantial certainty of harm test necessary to constitute a willful and malicious injury as contemplated by § 523(a)(6) of the Bankruptcy Code.

The district court addressed the transfer of GCIS assets to NPC during Milton's negotiations for employment with NPC. Mem. Op. at 51. Rather than pay for these assets, which secured the indebtedness owed to Rain Bird, NPC later reduced the unsecured debt, owed to NPC by GCIS, in the sum of $90,000.00 after Milton became an employee of NPC. *Id.* The court found that the transfer of encumbered assets in exchange for a reduction in unsecured debt served to diminish the value of GCIS's stock by $90,000.00. Consequently, Rain Bird was damaged in this amount in its capacity as the pledgee of this stock.

As set forth in the following comment, the district court concluded that Milton occupied a fiduciary relationship to Rain Bird under Mississippi law, to-wit:

A corporate director or officer owes a fiduciary duty to the corporation's creditors as well, and he may not use his position to benefit himself at their expense. *Cooper v. Mississippi Land Company*, 220 So.2d 302, 307 (Miss. 1969). " As such, an officer or director must act in accordance with the best interests of the corporation and by the strict standards of rectitude that bind a

fiduciary; he is not entitled to use his position for personal gain where harm will befall the corporation, *its creditors,* or stockholders." *Home Telephone Company v. Darley,* 355 F.Supp. 992, 999 (N.D.Miss.1973) (emphasis added).

Furthermore, a director or officer who is a pledgor of corporate stock, and who is in effective control of the corporation, owes a fiduciary duty to the pledgee of the stock. *Gibson v. Manuel,* 534 So.2d 199, 202–03 (Miss.1988). The reason is that "[a] pledgee holding a security interest in corporate shares is a potential shareholder. He has the same interest and concern as a shareholder that the corporate affairs be managed properly. If the officers default, the pledgee suffers harm not unlike that experienced by the shareholder." *Gibson,* 534 So.2d at 202. "The content and particulars are the same as those duties an officer or director owes to shareholders." *Id.* at 203.

Mem. Op. at 47.

In the instant case, it is undisputed that Milton and Salisbury were officers and directors of GCIS, and that after resigning as officers, they remained as directors. It is also undisputed that Rain Bird was a secured creditor of GCIS in the amount of $1.5 million. It is further undisputed that Milton and Salisbury were pledgors of GCIS stock, that Milton, at least, was at all relevant times in effective control of GCIS, and that Rain Bird was the pledgee of all the GCIS stock. Therefore, the Court finds by clear and convincing evidence that Milton and Salisbury, as GCIS directors, and Milton, as a pledgor of corporate stock who was in effective control of the corporation, owed a fiduciary duty to Rain Bird as a creditor of GCIS and as a pledgee of GCIS stock. As such, Milton and Salisbury owed a duty to refrain from taking actions for their own benefit where harm would befall Rain Bird, and NPC is liable as well if it knowingly participated or assisted Milton or Salisbury in any breaches of their fiduciary duty.

Mem. Op. at 48.

A corporate fiduciary "is not entitled to profits beyond the earnings of his stock, a proper compensation and expenses." *Knox Glass Bottle Company,* 89 So.2d at 815 (quoting Fletcher, Corporations, Sec. 884 (1947)). It is undisputed that the severance packages were not disclosed to Rain Bird. Given GCIS' admittedly dire financial situation, the Court finds that the $215,476 in severance, based upon Milton's wife's severance from an international pharmaceutical corporation traded on the New York Stock Exchange, does not qualify as proper compensation for which the corporation received full and adequate compensation. No doubt the interests of GCIS and Rain Bird would have been better served had that money been used for business operations or to pay down GCIS' secured debts.

Mem. Op. at 49 and 50.

The district court concluded that the $126,220.00 severance package taken by Milton for his own personal profit was damaging to the interest of Rain Bird as the pledgee of all of the corporate stock of GCIS, as well as, a substantial creditor of GCIS. In this context, the court concluded that the withdrawal adversely affected the value of the GCIS stock.

The district court reached the identical conclusion concerning the $5,000.00 profit that Milton improperly earned as a result of the wrongful transfer of assets from GCIS to PPS. Mem. Op. at 50 and 51.

In *Gupta v. Eastern Idaho Tumor Institute, Inc., (Matter of Gupta),* 394 F.3d 347 (5th Cir.2004), Judge Edith Jones ex-

plained that for dischargeability purposes, whether a debtor stood in a fiduciary capacity to a creditor was a question of federal law. Her analysis is set forth as follows, to-wit:

A bankruptcy court may apply collateral estoppel in a dischargeability proceeding to preclude relitigation of state court findings that are relevant to dischargeability. *See Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 181 (5th Cir. 1997) (citing *Grogan v. Garner*, 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991)). The ultimate determination of dischargeability is, however, a federal question. As we have elaborated, "The scope of the concept of fiduciary under 11 U.S.C. § 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists." *LSP Inv. Partnershp v. Bennett (In re Bennett)*, 989 F.2d 779, 784 (5th Cir.1993) (relying on *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1335–41 (5th Cir.1980)). The problem in this case is how to interpret the jury's finding of a breach of fiduciary duty in light of Texas partnership law and this circuit's interpretation of the federal standard.

Bankruptcy law has consistently rendered non-dischargeable debts that arise from "fraud or defalcation while acting in a fiduciary capacity...." 11 U.S.C. § 523(a)(4). Justice Cardozo explained a predecessor provision as follows:

It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*. He must have been a trustee before the wrong and without reference thereto. *Davis v. Aetna Accept. Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 154, 79 L.Ed. 393 (1934). *Davis* goes on to hold that a debtor was not a trustee "in that strict and narrow sense" *id.*, when he allegedly converted property subject to the creditor's security interest. Implementing *Davis*, this court has held that a trust relationship imposed by Louisiana statute on the dealings between a homebuilder and his customers was, on the facts presented, insufficient to establish a non-dischargeable breach of fiduciary duty. *Angelle*, 610 F.2d at 1335–41. The court emphasized that a trust must exist "prior to the wrong and without reference to it," *id.* at 1340. in order to constitute a "technical trust" within the non-dischargeability provision. [FN3] This court has, on the other hand, not hesitated to conclude that debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles, are non-dischargeable. Thus, debts of corporate officers to the corporation or a minority shareholder have been held non-dischargeable, as have the debts of a managing partner of a limited partnership to the limited partners. *Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 421 (5th Cir.1990); *Bennett*, 989 F.2d at 791; *Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 117 (5th Cir. 1993).

394 F.3d at 349–50.

■ Applying federal law to the factual and legal conclusions reached by the district court, Milton stood in a fiduciary position to Rain Bird prior to the alleged wrongful acts and without reference to those acts.

In *Moreno v. Ashworth (Matter of Moreno)*, 892 F.2d 417 (5th Cir.1990), another opinion authored by Judge Jones, the Fifth Circuit articulated a definition of "defalcation" as follows:

A defalcation is a willful neglect of duty, even if not accompanied by fraud or

embezzlement. *See* L. King, 3 Collier on Bankruptcy ¶ 523.14 at 523–93 to 523–95 (15th ed.1988), quoting *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510 (2d Cir.1937) (L.Hand, J.). Moreno does not dispute that he owed a fiduciary duty to PEEC because he was an officer. This duty encompassed, at least, a responsibility not to lend PEEC's money to himself or corporations controlled by him on less than an arms-length basis. *See generally Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 719 (5th Cir. 1984). *See also International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567 (Tex.1963).

892 F.2d at 421.

Although the district court did not use the word "defalcation" in its opinion, this court concludes that Milton's conduct falls squarely within the definition set forth in *Moreno.*

Consequently, the $126,220.00 severance package wrongfully taken by Milton, as well as, the $5,000.00 profit that he earned by wrongfully participating in the transfer of assets from GCIS to PPS are non-dischargeable debts pursuant to § 523(a)(4) of the Bankruptcy Code.

■] Although it was not addressed in the motion for partial summary judgment, the actions by Milton in wrongfully taking the severance package and profiting by improperly disposing of GCIS' assets to the detriment of Rain Bird's interest in the GCIS corporate stock, would, as a matter of law, constitute willful and malicious conduct consistent with the objective substantial certainty of harm standard recognized by the Fifth Circuit. Milton's participation in these transactions amounted to a wrongful conversion of assets.

## V.

### *The Punitive Damage Award Against Milton in the Amount of $500,000.00*

■ This court has previously held that there is "ample authority...for the proposition that where wilfulness and malice exist", compensatory and *punitive damages* flowing therefrom are non-dischargeable under 11 U.S.C. § 523(a)(6), *In re Horowitz,* 103 B.R. 786, 790 (Bankr. N.D.Miss.1989) (emphasis added), citing *Combs v. Richardson,* 838 F.2d 112, 117 (4th Cir.1988); *In re Adams,* 761 F.2d 1422, 1427 (9th Cir.1985); *In re Nix,* 92 B.R. 164, 170 (Bankr.N.D.Tex.1988); *In re Dean,* 79 B.R. 659, 663 (Bankr.N.D.Tex. 1987); *In re Siefke,* 61 B.R. 220, 222 (Bankr.D.Mont.1986); *In re Mueller,* 34 B.R. 869, 872 (Bankr.D.Colo.1983).

In this case, the district court found that the conduct of Milton and NPC "evidenced a willful, capricious and malicious disregard of Rain Bird's rights." Mem. Op. at 56. In awarding punitive damages against Milton, the court considered "the reprehensibility of the defendants' intentional, willful and malicious conduct." *Id.* at 57. Based on these conclusions, the district court awarded punitive damages against Milton in the sum of $500,000.00.

This court has previously applied the doctrine of collateral estoppel in order to give preclusive effect to compensatory and punitive damage awards where the finder of fact concluded that the defendant's conduct was willful and malicious. *In re Evans,* 252 B.R. 366, 370–71 (Bankr. N.D.Miss.2000); *In re Jordan,* 151 B.R. 373, 374 (Bankr.N.D.Miss.1992). Therefore, this court determines that the decision of the district court to the effect that Milton's conduct was willful and malicious should be given preclusive effect, and, therefore, the $500,000.00 punitive damage

**587**

award is non-dischargeable pursuant to § 523(a)(6) of the Bankruptcy Code.

VI.

*Conclusion*

Consequently, this court determines that the following debts are non-dischargeable in Milton's bankruptcy case, to-wit:

(a) $1,200,000.00, the damages awarded because of Milton's tortious interference with Rain Bird's contract with GCIS, the tortious interference with Rain Bird's business relations with its customers, and the misappropriation of Rain Bird's trade secrets pursuant to § 523(a)(6) of the Bankruptcy Code.

(b) $1,537,947.00, the damages awarded for breach of fiduciary duty and tortious interference with contract pursuant to § 523(a)(4) and § 523(a)(6) of the Bankruptcy Code.

(c) $126,220.00, the damages awarded because of Milton's wrongful taking of the severance package which amounts to a defalcation while acting in a fiduciary capacity pursuant to § 523(a)(4) of the Bankruptcy Code.

(d) $5,000.00, the damages awarded because of Milton's wrongful profiting from the transfer of assets to PPS which amounts to a defalcation while acting in a fiduciary capacity pursuant to § 523(a)(4) of the Bankruptcy Code.

(e) $500,000.00, the punitive damages awarded because of the reprehensibility of Milton's intentional, willful, and malicious conduct pursuant to § 523(a)(6) of the Bankruptcy Code.

(f) Alternatively, the sums of $126,220.00 and $5,000.00 are non-dischargeable debts as willful and malicious injuries pursuant to § 523(a)(6)

of the Bankruptcy Code because of Milton's wrongful conversion of assets.

As noted in the opening paragraph, Milton also filed a Motion and Amended Motion for Partial Summary Judgment asserting the application of collateral estoppel. For the reasons set forth in this Opinion, Milton's motion is not well taken and will be overruled.

However, Milton should be given credit for the payment made by NPC to Rain Bird which would effectively reduce by the commensurate amount Milton's joint and several liability on the non-dischargeable debts owed by Milton to Rain Bird.

A separate Judgment will be entered consistent with this Opinion.